# CASES

DETERMINED IN THE

# APPELLATE COURTS OF ILLINOIS

## DURING THE YEAR 1926.

People ex rel. First National Pictures, Appellee, v.
William E. Dever, Mayor, et al., Appellants.

### Gen. No. 30,634.

1. MANDAMUS—*sufficiency of evidence to support verdict of jury,
in proceedings to compel issuance of permit for showing of motion
picture.* The verdict of a jury in mandamus proceedings to· compel
issuance of an unlimited permit for the showing of a motion picture, that such picture is not immoral within the meaning of Chicago Municipal Code § 2787, held against the weight of the evidence.

2. MANDAMUS—*verdict of jury as conclusive of issue as to immorality of motion picture within meaning of regulative ordinance.*
The verdict of a jury, in mandamus proceedings to compel issuance
of an unlimited permit to show a motion picture, that such picture
is not immoral within the meaning of Chicago Municipal Code
§ 2787, is not conclusive upon the Appellate Court, nor does it preclude the court from applying accepted definitions of immorality
in forming its own judgment as to the matter in issue.

Appeal by defendants from the Superior Court of Cook county;
the Hon. HUGO PAM, Judge, presiding. Heard in the second division,
of this court for the first district at the October term, 1925. Reversed and remanded. Opinion filed October 5, 1926.

FRANCIS X. BUSCH, Corporation Counsel, for appellants; JAMES J. COUGHLIN, Assistant Corporation
Counsel, of counsel.

LEESMAN & ROEMER, for appellee.

MR. JUSTICE BARNES delivered the opinion of the court.

This is a mandamus proceeding. On submission of the issues to a jury there was a verdict for petitioner, and an order that a writ of mandamus issue, as prayed, against the mayor and superintendent of police, respectively, of the City of Chicago, directing them to grant a permit to exhibit in said city a moving picture or a photoplay called "Chickie," of which petitioner is producer and owner. Respondents appeal from that order.

The issues arise on the application to such photoplay of certain city ordinances, as codified in the "Chicago Municipal Code of 1922."

Section 2786 of said code provides that before granting a permit the superintendent of police shall inspect the picture or series of pictures, or cause them to be inspected, and either grant or deny a permit.

Section 2787, so far as applicable to the case before us, provides: "If a picture or series of pictures for the showing or exhibition of which an application for a permit is made, is immoral * * *, it shall be the duty of the superintendent of police to refuse such permit, otherwise it shall be his duty to grant such permit."

It also provides that in case of his refusal to grant such a permit an appeal may be taken to the mayor, whose action shall be final. There was such an appeal in this case and the refusal was upheld.

Section 2788 provides that where a permit has been refused under a provision of section 2787 because the picture "tends towards creating a harmful impression on the minds of children where such tendency as to the minds of adults would not exist if exhibited only to persons of mature age," the superintendent of police may grant a special permit limiting the exhibi-

tion of such picture or series of pictures to persons over the age of twenty-one years.

Aside from formal allegations not questioned, the petition sets forth the provisions of the city ordinances relating to the subject, and after describing scenes from the photoplay, and denying that it presents any characteristic or condition that would require a refusal of a permit under section 2787 of the code, the petition charges that the action in refusing the permit was "purely arbitrary, unreasonable and discriminatory."

In their answer respondents admit the formal allegations, deny the picture is not immoral or obscene, and describe certain incidents and scenes of the picture as immoral and justifying a refusal of an unlimited permit, averring it would create a harmful impression on the minds of children, particularly adolescents.

There was proof of inspection and censorship of the picture as provided for by the ordinance, and of the opinion of the censors that a special permit only should be granted as provided under section 2788. The only other evidence adduced consisted of the film and its projection on the screen before the court and jury. The film has been certified to us as an exhibit in the case, and also projected on the screen before us.

The only point raised on the appeal is that the verdict is against the manifest weight of the evidence, and merely goes to one question of fact, whether the picture is "immoral" in the sense in which that term is used in the ordinance. There being no proof of any act or motive indicating caprice or an arbitrary exercise of power in refusing an unlimited permit, and defendant having been offered a limited permit, it is clear that the refusal of an unlimited permit was based on the conclusion of the censor or censors that the photoplay is immoral as tending to create a harmful impression on the minds of children.

We are at once confronted with the question of what is meant by the word "immoral" in the ordinance. Considering a like ordinance it was said in *Block v. City of Chicago,* 239 Ill. 251, that no definition could be formulated which would afford a better standard than the words of the ordinance, and that while people may differ on the subject of what is immoral "the average person of healthy and wholesome mind knows well enough what the words 'immoral' and 'obscene' mean and can intelligently apply the test to any picture presented to him." Seizing upon this observation, which is more or less a truism, appellee would have the verdict left undisturbed on the theory that a jury must represent the "average person of healthy and wholesome mind." We cannot accept this conclusion as a criterion for our own judgment. While such decision gives no definition of immorality, and there was apparently no necessity therefor in that case, it is not to be inferred therefrom that in determining a disputed fact as to what is immoral recourse may not be had to accepted definitions. The word "immoral" in its legal and commercial sense is defined in the Century Dictionary as "contrary to good order or public welfare." As aptly said in a note on p. 621, vol. 1, Rapalje and Lawrence's Dictionary: "When we call a thing immoral in a legal sense, we do not mean so much that it is ethically wrong as that, according to the understanding of reasonable men, it would be a scandal for a court of justice to treat it as lawful or indifferent, though the transaction may not come under any positive prohibition or penalty."

It is in this sense of its relation to public welfare that the word must be regarded as used in statutes and ordinances intended to create and promote such welfare. The two sections referred to must be considered together in ascertaining its meaning. So considered, they manifestly contemplate as the first determining factor whether the picture is of a character

that forbids an unlimited permit because of a tendency to create a harmful impression in point of morals on the minds of children or persons under the age of twenty-one. If so, then the test forbids a permit under section 2787, but not necessarily under section 2788. While the ordinance unquestionably has in view the protection of public morals it recognizes a difference between adults and minors as to the impressionability of their minds, and that what would have an immoral influence upon the latter might not reasonably have any such effect on the former. Any one familiar with the danger of immoral suggestions to children, especially in their adolescence, would not question the wisdom of excluding them from exhibitions which addressed such suggestions to their immature minds.

While the question of whether a photoplay is immoral within the intendment of the ordinances so construed is ultimately one of fact there are no hard and fast lines of demarcation upon which it may be determined, and whether or not there is a sound discretion vested in the censors, we would be indisposed to interfere with the exercise of what seems to be a sound judgment in passing upon the question.

As before stated, we have viewed the picture, and concur in the judgment of the censors that while its character is perhaps not such as tends to create a harmful impression on the minds of adults it presents scenes, suggestions and sentiments of immorality calculated to create such an impression on the minds of adolescent children.

In support of this conclusion we need not recite the story in full or go into details, further than to indicate the general tenor of the play and its underlying theme.

It may be tersely described as presenting scenes in which an appeal to sexual passion is the central feature. Chickie, a young, poor girl, working in an office, engages the attention of a young man across the court

of a building and first meets him at a party in the luxurious home of a worldly woman, a friend of a wealthy roué. The latter had planned the gathering there of a fast set of young people, evidently votaries of the "new freedom" with its flexible morals. At his instigation an office companion of Chickie, another intimate, sophisticated acquaintance of his, asked Chickie to the party where, being out of her social station and without suitable attire for the occasion, she is furnished with expensive attire by the hostess. So garbed, she descends the stairway to join the gathering, only to find that most of its members had disappeared into secluded corners, behind curtains, or on a sofa, in dark or dimly-lighted rooms, where she catches glimpses of couples in embraces and other attitudes suggesting most pointedly the sexual appeal. Shocked by these scenes she finds herself confronted by the roué and evidently realizes that she is the object of his desire for a new conquest. Frightened by the scenes and the repulsive looks and manner betraying his lascivious design, she flees, but is overtaken in the dark by the young man in whom she had become interested, and he takes advantage of the occasion to drive her about in an automobile all night and to engage her affections. At a later date he betrays her, and her family is plunged into sorrow and disgrace by her delicate condition. Still unbaffled, the roué gets her to accept a dinner in a private room of a restaurant, where, continuing his designs, he insinuatingly expresses to her this sentiment: "Men are becoming as tolerant as women and every experience makes a woman more lovable." Another scene shows her in his private rooms, and when he finds his seductive arts have failed he assumes to have and to assert love for her. Then follows a disclosure of her delicate condition, and when she reminds him of the Mephistophelian sentiment he had previously expressed, he replies: "That was before I loved you."

Other scenes characterized by a like disregard of moral standards might be mentioned, but we have described enough to justify our conclusion. The fact that the play ends in the marriage of the young couple does not redeem it from its moral ugliness.

Good morals are established by well known general usages of society, and a verdict in defiance of the moral standards they recognize should not be upheld. The judgment is reversed and the cause remanded.

*Reversed and remanded.*

GRIDLEY, P. J., and FITCH, J., concur.