In the Matter of COMMERCIAL PICTURES CORPORATION, Appellant, against BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, Respondent.

Argued January 7, 1953; decided May 28, 1953.

*Florence Perlow Shientag* for appellant. I. Motion pictures are protected by the free speech and press guarantees of the First and Fourteenth Amendments of the Federal Constitution and section 8 of article I of the New York Constitution. (*Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495; *Mutual Film Corp.* v. *Ohio Ind. Comm.,* 236 U. S. 230.) II. Previous restraint on the exhibition of films violates the First and Fourteenth Amendments of the Federal Constitution and section 8 of article I of the New York Constitution. (*Niemotko* v. *Maryland,* 340 U. S. 268; *Cantwell* v. *Connecticut,* 310 U. S. 296.) III. If a system of licensing motion pictures may be constitutional, the system under section 122 of the Education Law is unconstitutional in permitting censorship of films which are '' immoral '' or '' tend to corrupt morals ''. (*Gelling* v. *Texas,* 343 U. S. 960; *Schuman* v. *Pickert,* 277 Mich. 225; *Matter of Foy Productions* v. *Graves,* 253 App. Div. 475; *Winters* v. *New York,* 333 U. S. 507; *Thornhill* v. *Alabama,* 310 U. S. 88; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Kunz* v. *New York,* 340 U. S. 290.) IV. Assuming that a valid licensing system is established, prior restraint should be applied only in exceptional cases. Generally, only a clear and present danger, some pressing public need, would justify prior restraint on free speech. (*Dennis* v. *United States,* 341 U. S. 494; *Thornhill* v. *Alabama,* 310 U. S. 88; *Matter of Joseph Burstyn, Inc.,* v. *Wilson,* 303 N. Y. 242.) V. No danger of injury to the government or breach of peace or invasion of rights of others exists or is claimed by the Regents to exist as a ground for refusing a license to '' La Ronde ''. VI. The burden is on the Regents to show that the denial of the license was proper, that '' La Ronde '' is immoral and tends to corrupt morals, and that burden was not sustained. (*United States* v. *One Book Entitled Ulysses,* 72 F. 2d 705.) VII. It was the duty of the court below to make an independent determination as to whether '' La Ronde '' is immoral or tends to corrupt morals. The court below erred in applying the '' substantial evidence '' test, and, if the statute requires the court to apply such test, then

it is unconstitutional. (*Niemotko* v. *Maryland,* 340 U. S. 268; *Norris* v. *Alabama,* 294 U. S. 587; *Matter of Miller* v. *Kling,* 291 N. Y. 65; *Matter of Joseph Burstyn, Inc.,* v. *Wilson,* 303 N. Y. 242.)

*Sidney Freidberg* and *Beate Bloch* for Hygienic Productions, Inc., *amicus curiæ,* in support of appellant's position. I. Motion pictures, as an organ of the free press, are included within the protection of the First and Fourteenth Amendments to the United States Constitution and section 8 of article I of the New York Constitution. (*Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495.) II. Part II of article 3 of the Education Law imposes an unconstitutional '' prior restraint '' upon the publication and distribution of motion pictures. (*Lovell* v. *Griffin,* 303 U. S. 444; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568.) III. The New York censorship statute does not meet the constitutional requirements of due process of law. (*Matter of American Comm. on Maternal Welfare* v. *Mangan,* 257 App. Div. 570, 283 N. Y. 551.) IV. The New York censorship statute is unconstitutional because it denies equal protection of the laws to motion pictures in general and to motion pictures exhibited for entertainment and profit in particular. (*Mutual Film Corp.* v. *Ohio Ind. Comm.,* 236 U. S. 230.) V. The New York censorship statute is unconstitutional on the ground that it is so vague and indefinite as to permit '' substantially unbridled censorship '', which has been expressly condemned by the United States Supreme Court. (*Schuman* v. *Pickert,* 277 Mich. 225; *Winters* v. *New York,* 333 U. S. 507; *People* v. *Muller,* 96 N. Y. 408; *People* v. *Eastman,* 188 N. Y. 478; *People* v. *Wendling,* 258 N. Y. 451; *People* v. *Berg,* 241 App. Div. 543, 269 N. Y. 514; *People* v. *Miller,* 155 Misc. 446; *People* v. *Vanguard Press,* 192 Misc. 127; *People* v. *Larsen,* 5 N. Y. S. 2d 55; *People* v. *Winters,* 294 N. Y. 545; *United States* v. *Dennett,* 39 F. 2d 564; *United States* v. *One Obscene Book Entitled '' Married Love '',* 48 F. 2d 821; *Parmelee* v. *United States,* 113 F. 2d 729; *United States* v. *Barlow,* 56 F. Supp. 795, 323 U. S. 805; *Walker* v. *Popenoe,* 149 F. 2d 511.)

*Charles A. Brind, Jr., Counsel* (*John P. Jehu, Elizabeth M. Eastman* and *George B. Farrington* of counsel), for respondent. The motion picture film '' La Ronde '' (revised) was properly

rejected as being " immoral " and its exhibition would " tend to corrupt morals ". (*Matter of Foy Productions* v. *Graves,* 253 App. Div. 475, 278 N. Y. 498; *Matter of Distinguished Films* v. *Stoddard,* 271 App. Div. 715; *Matter of Eureka Productions* v. *Byrne,* 252 App. Div. 355; *Matter of American Comm. on Maternal Welfare* v. *Mangan,* 257 App. Div. 570, 283 N. Y. 551.)

FROESSEL, J. The Motion Picture Division of the State Education Department and the Regents of the University of the State of New York have determined that the motion picture " La Ronde " (revised), produced in France, is not entitled to be licensed for public exhibition, upon the ground that it is " immoral " and " would tend to corrupt morals" within the meaning of section 122 of the Education Law of this State. The Appellate Division has confirmed the determination.

The film from beginning to end deals with promiscuity, adultery, fornication and seduction. It portrays ten episodes, with a narrator. Except for the husband and wife episode, each deals with an illicit amorous adventure between two persons, one of the two partners becoming the principal in the next. The first episode begins with a prostitute and a soldier. Since the former's room is ten minutes walk from their meeting place on the street, and the soldier must hurry back to his barracks, they take advantage of the local environment. She informs him that " civilians " pay, but for " boys like you it's nothing ". The cycle continues with the soldier and a parlormaid; the parlormaid and her employer's son; the latter and a young married woman; the married woman and her husband; the husband and a young girl; the girl and a poet; the poet and an actress; the actress and a count, and finally the count and the prostitute. At the very end, the narrator reminds the audience of the author's thesis: " It is the story of everyone ".

Petitioner contends that the statute is invalid, in that it imposes a prior restraint upon the exercise of freedom of speech and press, relying principally upon *Joseph Burstyn, Inc.* v. *Wilson* (343 U. S. 495 [1952]), which overruled *Mutual Film Corp.* v. *Ohio Ind. Comm.* (236 U. S. 230 [1915]). In addition, it is contended that the standard here applied is too vague and indefinite to satisfy the requirements of due process. Respondent maintains that the *Burstyn* case (*supra*) is not controlling

here, and that the standard in question is sufficiently clear and definite. The issues so presented may be posed thus:

(1) Are motion pictures, as part of the press, altogether exempt from prior restraint or censorship?

(2) Do the words " immoral " and " tend to corrupt morals ", in section 122 of the Education Law, viewed in the perspective of their legislative setting, fail to provide a standard adequate to satisfy the requirements of due process?

(3) Has the statute been properly applied herein?

1. Our answer to the first question must be in the negative, as it was in the *Burstyn* case in this court (*Matter of Joseph Burstyn, Inc.,* v. *Wilson,* 303 N. Y. 242, 262; see, also, concurring opinion of DESMOND, J., at pp. 263–264). That question was not reached by the Supreme Court of the United States in *Joseph Burstyn, Inc.* v. *Wilson* (343 U. S. 495, *supra,* pp. 502–503, 505–506), and the language employed therein aptly refutes the notion that all media of communication may be grouped under a precise and absolute rule: " To hold that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, however, is not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places. That much is evident from the series of decisions of this Court with respect to other media of communication of ideas. Nor does it follow that motion pictures are necessarily subject to the precise rules governing any other particular method of expression. Each method tends to present its own peculiar problems." Nor did *Gelling* v. *Texas* (343 U. S. 960), decided the week following on the authority of the *Burstyn* case (343 U. S. 495, *supra*), resolve the issue left open therein.

Insofar, then, as motion pictures tend to present their " own peculiar problems ", we think they may properly become the subject of special measures of control. If, as we believe, motion pictures may present a " clear and present danger " of substantive evil to the community (*Schenck* v. *United States,* 249 U. S. 47, 52), then the Legislature may act to guard against such evil, though in so doing it overrides to a degree the right to free expression (*Poulos* v. *New Hampshire,* 345 U. S. 395;

*Beauharnais* v. *Illinois*, 343 U. S. 250; *Dennis* v. *United States*, 341 U. S. 494; *Communications Assn.* v. *Douds*, 339 U. S. 382; *Kovacs* v. *Cooper*, 336 U. S. 77; *Chaplinsky* v. *New Hampshire*, 315 U. S. 568; *Schenck* v. *United States*, supra; *Fox* v. *Washington*, 236 U. S. 273). As was said in *Crowley* v. *Christensen* (137 U. S. 86, 89): "the possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will."

The highest court in the land has recognized the right of the State to act to protect its citizens, even to the extreme of interfering with personal liberty, against the threat of disease (*Jacobson* v. *Massachusetts*, 197 U. S. 11). In that case, the court declared (p. 27): "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." The same court later held that principle broad enough to permit the State to protect itself against the perpetuation of heredity strains of imbecility through sterilization (*Buck* v. *Bell*, 274 U. S. 200, 207). If it may so act to prevent physical disease or the birth of the " manifestly unfit ", may it not likewise act to prevent moral corruption, when the consequences thereof affect not only family life, as we know it in this State and country, but the health and welfare of our people as well?

The problem of preserving individual rights under the Constitution and still securing to the State the right to protect itself is not always an easy one, and it is sometimes difficult to find the proper balance between them. There is no mathematical formula for accommodating the rights of the individual to the good of the community, and we fully recognize that care must be exercised when preserving one not to suppress the other. But there " is no basis for saying that freedom and order are not compatible. That would be a decision of desperation. Regulation and suppression are not the same, either in purpose or result, and the courts of justice can tell the difference " (*Poulos* v. *New Hampshire*, supra, p. 408).

Of course it is true that the State may not impose upon its inhabitants the moral code of saints, but, if it is to survive, it must be free to take such reasonable and appropriate measures as may be deemed necessary to preserve the institution of marriage and the home, and the health and welfare of its inhabitants. History bears witness to the fate of peoples who have become indifferent to the vice of indiscriminate sexual immorality — a most serious threat to the family, the home and the State. An attempt to combat such threat is embodied in the sections of the Education Law here challenged. It should not be thwarted by any doctrinaire approach to the problems of free speech raised thereby.

That a motion picture which panders to base human emotions is a breeding ground for sensuality, depravity, licentiousness and sexual immorality can hardly be doubted. That these vices represent a " clear and present danger " to the body social seems manifestly clear. The danger to youth is self-evident. And so adults, who may react with limited concern to a portrayal of larceny, will tend to react quite differently to a presentation wholly devoted to promiscuity, seductively portrayed in such manner as to invite concupiscence and condone its promiscuous satisfaction, with its evil social consequences. A single motion picture may be seen simultaneously in theatres throughout the State. May nothing be done to prevent countless individuals from being exposed to its vicious effects? To us the answer seems obvious, especially in the light of recent technical developments which render the problem more acute than ever. Now we have commercially feasible three dimensional projection, some forms of which are said to bring the audience " right into the picture ". There can be no doubt that attempts will be made to bring the audience right into the bedchamber if it be held that the State is impotent to apply preventive measures.

Such preventive measures necessarily embrace some form of censorship. It is significant that the American motion picture industry has adopted that very method of self-discipline as the effective remedy for immoral motion pictures through its well-known Code of Production Standards. The people of this State should not be compelled to rely upon the motion picture indus-

try's own standards of review; nor, in the case of a foreign film, solely upon the customs officials (U. S. Code, tit. 19, § 1305), for their judgment "in admitting the film did not prevent the state officers from arriving at a different judgment when it came to the exhibition of the film and the granting of a license therefor" (*Eureka Productions* v. *Lehman,* 17 F. Supp. 259, 261, affd. 302 U. S. 634, 304 U. S. 541). They have the right to exercise their own sovereign powers to determine for themselves what motion pictures transgress the bounds of decency and sexual morality laid down by common consent.

As we see it, a statute which operates within limits suited to the attainment of such objectives, as does the enactment here challenged, is a reasonable and valid exercise of the police power. No other method will afford reasonably adequate protection to the public. Moreover, our statute places its administration in the hands of a responsible State agency, rather than with local officers who may at times be subject to petty prejudices or varying provincial views. Neither is it entirely out of place to point out that experience has demonstrated over the years that such censorship has been and can be carried out without undue hardship or even inconvenience as to motion pictures which meet the standards for public exhibition. We conclude, therefore, that censorship, as such, is not in every case inimical to the rights of free speech and press guaranteed by the Constitution, so far as motion pictures are concerned.

2. We now turn to a consideration of the standard applied herein. Section 122 of the Education Law provides that a motion picture shall not be licensed if it is " obscene, indecent, *immoral,* inhuman, sacrilegious, or is of *such a character that its exhibition would tend to corrupt morals* or incite to crime ". We are concerned here only with the words we have italicized. Appellant would have us read them as though they stood alone, without other guide than their dictionary meanings, and thereby find them too broad and vague to serve as a valid standard for the limitation of constitutional rights. The Legislature has not used them in a vacuum, however, but in context with other words and in a setting with other statutes *in pari materia,* as, e.g., sections 1140-a and 1141 of the Penal Law. Moreover, the " use of common experience as a glossary is necessary to meet the

practical demands of legislation ", and the " requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding " (*Sproles* v. *Binford,* 286 U. S. 374, 393). Even in criminal law, " The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices " (*Jordan* v. *De George,* 341 U. S. 223, 231–232).

Our Legislature has used the word " immoral ", or its variants, in numerous other statutes (see Penal Law, §§ 483, 483-a, 483-b, 485, subd. 5; § 485-a, subd. 5; §§ 486, 494, 1140-a, 1141, 1141-a, 1147, 1290, subd. 4; §§ 1944-a, 2460; Education Law, §§ 2212, 3012, subd. 2; § 3013, subd. 2; §§ 3020, 6804; General Business Law, §§ 190, 191, subd. 3). Upon the basis of that standard, liberty, civil service tenure, and business licenses have been lost. To adopt the approach urged by petitioner would certainly throw doubt upon many of these enactments.

According to common understanding, the terms " immoral " and " morals " must be taken to refer to the moral standards of the community, the " norm or standard of behavior which struggles to make itself articulate in law " (Cardozo, Paradoxes of Legal Science, pp. 17, 41–42). Thus the standards of any special and particular segment of the whole population are not to control, but those held by the community at large. As was said in *Block* v. *City of Chicago* (239 Ill. 251, 263–264): " There are the shameless and unclean, to whom nothing is defilement and from whose point of view no picture would be considered immoral or obscene. Perhaps others could be found, with no laxity of morals, who pay homage to art and would not regard anything as indelicate or indecent which had artistic merit, and would look upon any person entertaining different sentiments as of inferior intelligence, without proper training on the subject and blinded with bigotry. Both classes are exceptional, and the average person of healthy and wholesome mind knows well enough what the words ' immoral ' and ' obscene ' mean and can intelligently apply the test to any picture presented to him."

As applied to the general moral standards of the community, it is urged that such a standard may be too broad, although

standards equally broad have been successfully applied. The term " moral turpitude " has been held adequate to satisfy even the strict rule applicable to criminal statutes, with the comment that " doubt as to the adequacy of a standard in less obvious cases does not render that standard unconstitutional " (*Jordan* v. *De George,* 341 U. S. 223, 232, *supra*). So, too, the term " good moral character ", as used in the immigration and nationality laws, must frequently be applied by the courts. In so doing, their measure is the " common standards of morality " prevalent in the community (*Estrin* v. *United States,* 80 F. 2d 105) or the " common conscience " of the community (*Johnson* v. *United States,* 186 F. 2d 588, 590).

It is not a valid criticism that such general moral standards may vary slightly from generation to generation. Such variations are inevitable and do not affect the application of the principle at a particular period in time (see *Parmelee* v. *United States,* 113 F. 2d 729). Neither may a standard be criticized on the ground that individual opinions may differ as to a particular application thereof. There is no principle or standard not subject to that infirmity, including the most specific provisions of the First Amendment (*Rochin* v. *California,* 342 U. S. 165, 170).

We are not unmindful of the fact that the provisions here in question, considered in the abstract, may be deemed broad, even as limited by common usage. Even in such case, however, it has been said that language " does not stand by itself  *  *  *  but is part of the whole body of common and statute law  *  *  * and is to be judged in that context " (*Musser* v. *Utah,* 333 U. S. 95, 97). In the case now before us, we should not " parse the statute as grammarians or treat it as an abstract exercise in lexicography " (*Beauharnais* v. *Illinois,* 343 U. S. 250, 253, *supra*), but should read it as it was meant to be read by the Legislature that enacted it. In many of the statutes in which our Legislature has used the word " immoral " it obviously refers to sexual immorality. It is our view that it is used similarly in section 122 of the Education Law, as can be perceived in the statute itself, and in the construction put upon it, not only by the Regents herein, but by this court as well.

Turning to the statute, it will be noted that there is a related usage — a gradation of language, proceeding from " obscene "

to " indecent " to " immoral ", words frequently used together in statutory enactments, and thence to generically different categories: " inhuman " and " sacrilegious ". That juxtaposition colors the word " immoral " and justifies the application of the rule *ejusdem generis,* particularly when coupled with the subsequent expression " tend to corrupt morals ", as was done here. (See McKinney's Cons. Laws of N. Y., Book 1, Statutes [1942 ed.], § 239; Penal Law, §§ 1140-a, 1141, where " obscene, indecent, immoral " are likewise grouped together; *People* v. *Wendling,* 258 N. Y. 451; *People* v. *Muller,* 96 N. Y. 408; *Regina* v. *Hicklin,* L. R. 3 Q. B. 360, 369–370; see, also, *Eureka Productions* v. *Lehman,* 17 F. Supp. 259, affd. 302 U. S. 634, 304 U. S. 541, *supra; Swearingen* v. *United States,* 161 U. S. 446, 451.)

Apart from these considerations, it would appear that we have already construed the statute in precisely this manner. Section 1140-a of the Penal Law, and related sections, have been held to apply to motion pictures even prior to their express inclusion therein (*Hughes Tool Co.* v. *Fielding,* 297 N. Y. 1024). The theory of that decision was that the Education Law and the Penal Law constitute complementary parts of a related whole. As used in the said Penal Law sections, the word " immoral " clearly relates to sexual immorality. Accordingly, its meaning in the Education Law should be the same, and the unpublished minutes of the proceedings of this court indicate that it was so treated in that case.*

Viewing the statute under consideration in its proper setting, then, the words " immoral " and " tend to corrupt morals " as used therein relate to standards of sexual morality. As such they are not vague or indefinite. In this sense they are kindred to " obscene " and " indecent ", of which we have said: " They are words in common use, and every person of ordinary intelligence understands their meaning, and readily and in most cases accurately applies them to any object or thing brought to his attention which involves a judgment as to the quality

---

* After our decision therein, section 1141 of the Penal Law was amended to exempt from its provisions moving picture films licensed by the State Department of Education (L. 1950, ch. 624). If, therefore, the State be required to grant a license here, petitioner will be immune from criminal prosecution.

indicated. It does not require an expert in art or literature to determine whether a picture is obscene or whether printed words are offensive to decency and good morals." (*People* v. *Muller, supra,* pp. 410–411.) (See, also, *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572, *supra.*) It should be remembered that we are not here dealing with a moral concept about which our people widely differ; sexual immorality is condemned throughout our land.

3. The remaining question is whether the statute has been properly invoked against the motion picture " La Ronde ". We have already noted that it is concerned solely with promiscuous sex relations and are told: " It is the story of everyone ". Although vulgar pornography is avoided, suggestive dialogue and action are present throughout and not merely incidentally, depicting promiscuity as the natural and normal relation between the sexes, whether married or unmarried. Can we disagree with the judgment that such a picture will tend to corrupt morals? To do so would close our eyes to the obvious facts of life. The story is patterned after the book, which was condemned for obscenity in *People* v. *Pesky* (230 App. Div. 200, 202, affd. 254 N. Y. 373). There the Appellate Division stated " there was nothing to it except a description of the licentious * * * without a single redeeming feature." The author of the original work himself felt that it " might very well be misunderstood and misinterpreted ", and so it was privately published. Even among the favorable reviews submitted by petitioner were such comments as:

" The details are concrete enough to make one blush unseen * * *.

" With something less than tremulous delicacy, he [the director] and his associate artists, speak quite freely upon the joys and woes of amorous adventure."

It may also be noted that among the industry's self-imposed limitations pertaining to sex are the following: " The sanctity of the institution of marriage and the home shall be upheld. Pictures shall not infer that low forms of sex relationship are the accepted or common thing." (Code of Production Standards, " Particular Applications " II, 1950 Year Book of Motion Pictures, pp. 920–922.) " La Ronde " infers just that. In the

minds of American motion picture producers, then, such a picture as is now before us would tend to " lower the moral standards of those who see it " (Code of Production Standards, " General Principles " 1).

We think it plain that we cannot say that the Regents were wrong in refusing the license herein. It has been suggested that we should form an independent judgment as to each picture which might become the subject of controversy between the distributor and the Regents, but that would simply mean that the powers granted to the Regents by statute could be arrogated to this court by judicial action. In the scheme of things, there must be some agency to which is entrusted the fact-finding power. In criminal cases it is the jury; in matters of administration generally, it is the administrative agency; in motion picture review, it is the Regents. No constitutional argument can be presented for having it otherwise. If the Regents err in law, we sit to correct them. If they must exercise their fact-finding powers in a close case and do so honestly and fairly, then due process has been observed (see *Nash* v. *United States,* 229 U. S. 373, 377).

It is not for us to question the wisdom of placing that fact-finding power in the hands of the Regents rather than the courts. Neither do we think any such debate could be very productive, for strong and persuasive arguments can be made to the effect that an experienced administrative body is better qualified than a court to judge the effect of a particular motion picture, and that we of the judicial branch should not be left " at liberty to substitute our judgment for theirs, or to supersede their function as the spokesmen of the thought and sentiment of the community in applying to the [motion picture]  *  *  *  the standard of propriety established by the statute " (*People* v. *Pesky, supra,* pp. 373–374).

In summary, we conclude that motion pictures may be censored, upon proper grounds, and that sexual immorality is one such ground. The standard " immoral " and " tend to corrupt morals " embodied in the statute and here applied relates to sexual immorality, and the Regents had the right to find that the motion picture in question falls within the prohibited category.

The order appealed from should be affirmed, with costs.

DESMOND, J. (concurring). I concur for affirmance.

We review the refusal by the Board of Regents of the State of New York, acting under sections 120 and 122 of the State Education Law, to license the exhibition in New York State of the motion picture " La Ronde ". Section 122 directs that every submitted motion picture film be licensed " unless such film or a part thereof is obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend to corrupt morals or incite to crime ". The stated ground for the Regents' refusal here was that " La Ronde " was " immoral and tended to corrupt morals ". The film depicts a series of illicit sexual adventures, nothing more, and is a close adaptation, for the screen, from Schnitzler's novel " Reigen " which, translated into English as " Hands Around ", was held to be criminally obscene in *People* v. *Pesky* (230 App. Div. 200, affd. 254 N. Y. 373). We have seen this motion picture, and, while we agree with appellant's counsel that it " has a distinguished cast and a brilliant production ", we find, too, that its only discoverable theme is this: that everyone is sexually promiscuous, and that life is just a " round " of sexual promiscuity. It would be understatement to apply to this photoplay the characterization given another film in *Matter of Eureka Productions* v. *Byrne* (252 App. Div. 355, 357) that it " unduly emphasizes the carnal side of the sex relationship ". This picture has no other content.

On this appeal, it seems to us, these three questions of law are to be answered, and in this order:

1. Is all pre-censorship of motion pictures violative of the First Amendment to the Federal Constitution?

2. If not, is the New York statute unconstitutional, for lack of precise standards, at the point where it permits the banning of a picture on a charge that it is " immoral " or " tends to corrupt morals "?

3. If questions 1 and 2 are both answered in the negative, was there reasonable basis here for the Regents' finding that " La Ronde " is immoral and tends to corrupt morals?

Our answers are these:

1. The New York State's motion picture censorship statute was enacted in 1921 (L. 1921, ch. 715), was held constitutional by this

court in 1923 (*Pathe Exch.* v. *Cobb,* 236 N. Y. 539), and except as to its use of " sacrilegious " as one of its standards, has never been held invalid. Our law, under which thousands of pictures have been licensed or denied licenses, is typical of the eight State statutes and perhaps seventy-five municipal ordinances that have made their appearance since the first such enactment: the Chicago ordinance of 1907 (*Block* v. *City of Chicago,* 239 Ill. 251). In the Federal courts, such censorship statutes were, beginning about 1915, held not to contravene the First Amendment, which, it was at that time held, did not apply to motion pictures, since the exhibition thereof was then regarded as a mere part of the business of providing entertainment in theatres (see *Mutual Film Corp.* v. *Ohio Ind. Comm.,* 236 U. S. 230; *Mutual Film Co.* v. *Ohio Ind. Comm.,* 236 U. S. 247; *Mutual Film Corp* v. *Kansas,* 236 U. S. 248). There were numerous similar holdings in various Federal and State courts. Appreciating the delicacy of the questions inherent in all censorship, but realizing, too, the danger, especially to the immature, of the free showing of demoralizing films (New York since 1909 has, for instance, limited attendance of children at motion picture theatres — see Penal Law, § 484, subd. 1), this sovereign State put the licensing power in one of its most powerful and most respected governmental bodies, the Board of Regents, a " citizens' board " which is at the head of the State's educational system. Censorship in New York is, therefore, carried on at the highest levels of responsible State Government.

In 1951, this court re-examined, in *Matter of Joseph Burstyn, Inc.,* v. *Wilson* (303 N. Y. 242) the question of the constitutionality of pre-censorship of films, and found no reason to change our earlier decision. Later, the Supreme Court of the United States, in the same *Burstyn* case (343 U. S. 495) decided for the first time (it had intimated this result in 1948 in *United States* v. *Paramount Pictures,* 334 U. S. 131, 166) that expression by means of motion pictures is included within the free speech and free press guarantee of the First and Fourteenth Amendments. Going further, the highest court held that the word " sacrilegious " provided no valid test or standard, since it subjected films to " conflicting currents of religious views " (*supra,* p. 504). But the Supreme Court

found it unnecessary, in *Burstyn*, to decide whether a State may censor motion pictures under a clearly drawn statute designed and applied to prevent, for instance, the showing of obscene films (pp. 505–506). Thus the *Burstyn* decision, while it ruled out "sacrilegious" as a permissible censoring standard, certainly did not strike down, completely, the police power of the States to pre-censor motion pictures. "It does not follow" said the court (*supra*, p. 502), "that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places." Historically, of course, the First Amendment has never provided immunity for every possible use of language (*Robertson* v. *Baldwin*, 165 U. S. 275, 281; *Frohwerk* v. *United States*, 249 U. S. 204, 206).

The constitutional doctrine which forbids pre-censorship of the press (*Near* v. *Minnesota*, 283 U. S. 697), expresses, primarily, the insistence of the American people that the publication of ideas and opinions, especially as to governments, public officers, and public questions should not be restrained here, as they had been elsewhere (see *Patterson* v. *Colorado*, 205 U. S. 454, 464, 465). And the doctrine itself has been subject always to an exception, as to publications which tend to corrupt morals or incite to crime or vice (see *People* v. *Gitlow*, 234 N. Y. 132; *People* v. *Most*, 171 N. Y. 423, 431; *Pathe Exch.* v. *Cobb*, 202 App. Div. 450, affd. 236 N. Y. 539, *supra*; *Patterson* v. *Colorado*, 205 U. S. 454, *supra*; *Schenck* v. *United States*, 249 U. S. 47; *Gitlow* v. *New York*, 268 U. S. 652, 666; *People* v. *Croswell*, 3 Johns. Cas. 336, 392 [1804]; Cooley on Constitutional Limitations [7th ed.], pp. 604–605). That exception usually finds application in post-punishment rather than pre-censorship, but the system of distribution and showing of motion pictures makes it feasible, if not necessary, to examine and license or refuse to license them before exhibition to audiences. We realize, as does everyone else, and as did the Supreme Court in 1915 in *Mutual Film Corp.* v. *Ohio Ind. Comm.* (*supra*) and in 1952 in *Joseph Burstyn, Inc.* v. *Wilson* (*supra*) that motion pictures have vast potentialities for evil, and we know, as practical people, that there is no effective way to suppress the damaging ones except by a system of censorship (see *Superior Films* v. *Department of Educ.*, 159 Ohio St. 315, April 29, 1953). "Justification for

upholding a censorship statute couched in indefinite terms may lie in the interest to be protected and not in semantics '' (37 Minn. L. Rev. 211). So, unless and until so constrained by higher judicial authority, we will not say that the police power of our State cannot be used to keep such evil from our people.

2. Next, we answer the question as to the sufficiency, as a standard for licensing, of the statutory language: '' immoral '' and '' tend to corrupt morals ''. We know that '' immoral '' is rather a sweeping term, of large and perhaps not mathematically delimited meaning, but we know, too, that if statutes could use only scientifically exact terminology, much of our statute law would be invalid. Words and phrases like '' moral '', '' immoral '', '' good moral character '', '' impairing morals '', etc., abound in New York statutes (see, for instance, Social Welfare Law, § 448; Penal Law, §§ 483, 485-a, 486, 494, 580, subd. 6; §§ 1140-a, 1141, 1141-a, 1145, 1147, 1148, 1933; Education Law, §§ 2212, 3012, 3013, 3020, 6804; General Business Law, §§ 190, 191; Agriculture and Markets Law, §§ 57, 57-a, and zoning statutes such as Village Law, § 175, and Town Law, § 261). In some of those statutes, the verbiage, because of context, limits itself to sexual morals — not so here, we think. Sexual impurity is only one form of immorality (see *Swearingen* v. *United States*, 161 U. S. 446, 451). This picture '' La Ronde '' could be classed as '' immoral '' in the narrower sense, too, but the statutory meaning here is the usual or dictionary one (including the law dictionaries), and its reference is to the generally accepted civilized code of morals — its prohibition is of material '' *contra bonos mores* ''. That, too, is the clearly intended meaning in several other censorship statutes (*Block* v. *City of Chicago*, 239 Ill. 251, 264, *supra*; *People ex rel. First Nat. Pictures* v. *Dever*, 242 Ill. App. 1; *Schuman* v. *Pickert*, 277 Mich. 225, 229; see *United States* v. *One Obscene Book Entitled '' Married Love '',* 48 F. 2d 821, 823). If it meant, in our statute, sexually vicious only, the word '' immoral '' would be tautological and repetitious, since it is there coupled with '' obscene '' and '' indecent ''. And why should our Legislature have placed a ban on one kind, only, of immorality? '' Immoral '' (or its antonym '' moral '') is a listed standard in at least five (besides New York) State motion picture censorship laws (those of Pennsylva-

nia, Ohio, Virginia, Kansas, Maryland). Indeed, the very word " moral " in the Ohio law was taken in its usual broad sense and held to be sufficiently definite for these purposes, in *Mutual Film Corp.* v. *Ohio Ind. Comm.* in these words (236 U. S. 230, 245–246, *supra*): " The objection to the statute is that it furnishes no standard of what is educational, moral, amusing or harmless, and hence leaves decision to arbitrary judgment. whim and caprice   *   *   *. But the statute by its provisions guards against such variant judgments, and its terms, like other general terms, get precision from the sense and experience of men and become certain and useful guides in reasoning and conduct. The exact specification of the instances of their application would be as impossible as the attempt would be futile. Upon such sense and experience, therefore, the law properly relies." We think the Supreme Court there must have read " moral " in the meaning we give it here, and the Supreme Court there pointed out that, unless words of such seeming generality were valid in statutes, government itself would become impossible. There can be no objection to the use, in a statute, of a word like " immoral " which includes many things, all of which are intended by the Legislature to be covered; otherwise, there would be barred from statutory use such customary verbiage as " fraudulent ", " due ", " negligent ", " arbitrary ", " reasonable ", etc. Legislatures use such words not " vaguely " but inclusively. That a word has many meanings, one or more of which are definitely pointed up by the surrounding verbiage, is no more reason for barring its use than if the word had one meaning only. It is too late to change the common usage of the word " immoral ", or to ascribe absurdity to it, so as to invalidate a statute. Although the Supreme Court, in *Burstyn* (*supra*), reversed that part of the *Mutual Film Corp.* holding which deals with the free speech question, *Mutual's* rule as to the propriety of " moral " or " immoral ", as a motion picture censorship standard in Ohio remains undisturbed, so far as we know. So the Ohio Supreme Court pointed out, on April 29, 1953, in *Superior Films* v. *Department of Educ.* (159 Ohio St. 315, *supra*).

Long ago our court (*Lyon* v. *Mitchell,* 36 N. Y. 235, 238) approved definitions of " morality " as " ' that science which teaches men their duty, and the reason of it ' " and as " ' the rule

which teaches us to live soberly and honestly. It hath four chief virtues, justice, prudence, temperance and fortitude.' " In that opinion, in 1867, our great predecessors on this bench wrote that: " Sound morals, as taught by the wise men of antiquity, as confirmed by the precepts of the gospel * * * are unchangeable. They are the same yesterday and to-day." We see no reason to retreat from those ideas. " We are a religious people whose institutions presuppose a Supreme Being " (*Zorach* v. *Clauson*, 343 U. S. 306, 313). Our Federal and State Constitutions assume that the moral code, which is part of God's order in this world, exists as the substance of society. The people of this State have acted through their Legislature, on that assumption. We have not so cast ourselves adrift from that code, nor are we so far gone in cynicism, that the word " immoral " has no meaning for us. Our duty, as a court, is to uphold and enforce the laws, not seek reasons for destroying them.

3. If there be validity to our answers above numbered 1 and 2, we will have no difficulty with the third question, that is, as to whether the Regents were justified in finding that " La Ronde " is immoral, and tends to corrupt morals. It is of no pertinence here that great literature of all ages, including the Sacred Scriptures, abounds with descriptions of rapes, fornications and adulteries. The difference here is that the whole theme, motif and subject matter of this film, its dominant and sole effect, is sexual immorality. The totality of it, and every part of it, is sexual immorality. The point is not that it depicts immoral conduct — it glorifies and romanticizes it, and conveys the idea that it is universal and inevitable. Are we as a court to say as matter of law that it does not thus " tend to corrupt morals "? This court should hold that the State of New York may prevent the publication of such matter, the obvious tendency of which is " to deprave or corrupt those whose minds are open to such immoral influences, and who might come into contact with it " (*People* v. *Muller*, 96 N. Y. 408, 411, following *Regina* v. *Hicklin*, L. R. 3 Q. B. 360, 369–370; see *People* v. *Doubleday & Co.*, 297 N. Y. 687, affd. 335 U. S. 848; *United States* v. *Dennett*, 39 F. 2d 564; *United States* v. *Levine*, 83 F. 2d 156). Such is the valid State policy and purpose, and we enforce it by affirming this Regents' determination.

The order should be affirmed, with costs.

Conway, J. (concurring). I am in entire accord with the opinion of Judge Froessel but believe that we may properly go further and therefore I fully agree also with the view stated by Judge Desmond in his concurring opinion.

Dye, J. (dissenting). By the decision about to be made, a majority of this court approves as a valid enactment, the New York motion picture licensing statute, notwithstanding that it provides for censorship in advance, which as we read it, constitutes an infringement of the basic civil right of freedom of speech and publication contrary to due process (U. S. Const., 1st, 5th, 14th Amendts.; N. Y. Const., art. I, §§ 6, 8; Education Law, § 122). I must therefore record my dissent.

The question arises out of the refusal of the State Board of Regents to approve the issuance of a license to permit the showing of the motion picture film " La Ronde " for the reason, couched in the language of the statute, " that the said film is ' immoral ' and that its exhibition ' would tend to corrupt morals ' within the meaning of Section 122 of the Education Law."

The case is before us in an appeal as of right from an order of the Appellate Division, Third Judicial Department, entered in a proceeding under article 78 of the Civil Practice Act, at the instance of this appellant (Education Law, § 124), and heard by the Appellate Division in the first instance (Civ. Prac. Act, § 1296). When the petitioner, a California corporation and sole owner of the distribution rights of the said picture in the United States, first applied for an exhibitor's license (Education Law, §§ 120–122) the director of the motion picture division refused it on the ground that the picture was " immoral " and " would tend to corrupt morals ". Following established practice in such circumstances, the petitioner re-edited the film and re-submitted its application, but even so the director again refused to issue a license. A review of his determination was then had before a three-man committee of the State Board of Regents (Education Law, § 124), which, after viewing the picture, as we have said, confirmed the director's determination. In the court below the confirmation of the determination and the dismissal of the proceedings was on the ground that the applicable statute was a valid enactment and that confirmation was

required under familiar doctrine limiting the function of a reviewing court whenever there is "warrant in the record and a reasonable basis in law" for the board's determination. In other words, if the issue is debatable, the action of the administrative body is to be upheld (*Matter of Mounting & Finishing Co.* v. *McGoldrick,* 294 N. Y. 104). However correct that may be as a rule of thumb in the review of administrative cases turning on a controverted issue of fact, it is inapplicable in a case involving fundamental civil rights secured by the State and Federal Constitutions for then a determination must be so clear, as the dissenting Judges in the court below observed, "that any conclusion to the contrary would not be entertained by any reasonable mind. It is wholly inconsistent with a constitutional guarantee to leave any debatable issue of morals, involved in any form of protected expression, to the final decision of an administrative agency." (*Matter of Commercial Pictures Corp.* v. *Board of Regents,* 280 App. Div. 260, 265.) In such a situation "the reviewing court is bound to re-examine the whole record" in the light of the challenge made (*Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495; *Universal Camera Corp.* v. *Labor Bd.,* 340 U. S. 474; *Niemotko* v. *Maryland,* 340 U. S. 268; *Norris* v. *Alabama,* 294 U. S. 587).

Since the decision in *Joseph Burstyn, Inc.* v. *Wilson* (343 U. S. 495, *supra,* revg. 303 N. Y. 242) there is no longer any doubt but that motion picture films enjoy the same constitutional freedom and protection accorded other media of human expression (cf. *United States* v. *Paramount Pictures,* 334 U. S. 131; *Stromberg* v. *California,* 283 U. S. 359) and this is so even though motion pictures as such are primarily designed to entertain at exhibitions conducted for private profit and even though motion picture films as such possess "a greater capacity for evil, particularly among the youth of a community, than other modes of expression" (*Burstyn, supra,* p. 502).

In the *Burstyn* case (*supra*) the Board of Regents had refused a license to show the motion picture entitled "The Miracle" on the ground that it was "sacrilegious" within the meaning of section 122 of the Education Law. When the case was in this court we approved such determination in reliance on the validity of regulation by prior censorship in accordance with our decision

in *Pathe Exch.* v. *Cobb* (236 N. Y. 539, affg. 202 App. Div. 450). That decision, in turn, had followed *Mutual Film Corp.* v. *Ohio Ind. Comm.* (236 U. S. 230), *Mutual Film Co.* v. *Ohio Ind. Comm.* (236 U. S. 247), and *Mutual Film Corp.* v. *Kansas* (236 U. S. 248), in which the United States Supreme Court had approved as a valid enactment in Ohio, a pre-censorship statute.

We note that in deciding the *Burstyn* case (*supra,* pp. 505–506) the United States Supreme Court found it unnecessary to pass on the issue of prior censorship preferring to leave such question until presented " under a clearly drawn statute designed and applied to prevent the showing of obscene films " since the term " sacrilegious ", the sole standard under attack, afforded an adequate basis for reversal. Nonetheless, that is not to say the learned court was unmindful of the iniquity of prior restraint which (in the field of publication) they long before had ruled (p. 503) was an " infringement upon freedom of expression to be especially condemned " (*Thomas* v. *Collins,* 323 U. S. 516; *Lovell* v. *Griffin,* 303 U. S. 444; *Grosjean* v. *American Press Co.,* 297 U. S. 233; *Near* v. *Minnesota,* 283 U. S. 697; *Patterson* v. *Colorado,* 205 U. S. 454).

Since the courts no longer see any distinction separating motion picture film from the protection accorded other media of communication, it follows as a matter of reason and logic that prior censorship of motion pictures is as to them as it is in other fields of expression, a denial of due process. In saying this we are, of course, mindful of the correlative obligation that in its exercise and enjoyment such right is not unlimited and absolute at all times and under all circumstances (*Chaplinsky* v. *New Hampshire,* 315 U. S. 568; *Cox* v. *New Hampshire,* 312 U. S. 569) but that such freedom may properly be restrained when inimical to the public welfare (*Gitlow* v. *New York,* 268 U. S. 652) and the State may punish its abuse (*Near* v. *Minnesota, supra*). It is equally well established that before such limitation may be imposed the abuse complained of is to be examined in all cases to determine whether it is of such a nature " as to create a clear and present danger [and] will bring about the substantive evils that Congress has a right to prevent " (*Schenck* v. *United States,* 249 U. S. 47, 52), which danger should be " apparent and imminent " (*Thornhill* v. *Alabama,* 310 U. S. 88) such,

for example, as a threat to overthrow the government by unconstitutional means (*Dennis* v. *United States,* 341 U. S. 494). By the same token, when public safety is involved, its restraint will be approved as a proper exercise of the police power (*Feiner* v. *New York,* 340 U. S. 315, affg. 300 N. Y. 391; *Kovacs* v. *Cooper,* 336 U. S. 77) or, to state it differently, there must be present some " overriding public interest " (see dissenting opinion per FULD, J., in *Matter of Joseph Burstyn, Inc.,* v. *Wilson, supra,* p. 269; *Thornhill* v. *Alabama, supra*), mere fear of possible injury is not enough (*Terminiello* v. *Chicago,* 337 U. S. 1).

Having in mind these well-recognized principles, it is pertinent to inquire what if anything there is about " La Ronde " that requires denial of constitutional safeguards and the imposition of the sanction of prior restraint. Is it because a showing would offend against some overriding need — would constitute a danger clear and present? We think not.

According to the record, the picture " La Ronde " since its admission through Customs without objection (U. S. Code, tit. 18, § 1462; U. S. Code, tit. 19, § 1305) has been exhibited throughout the United States in cities and towns in the States of Arizona, California, Colorado, Connecticut, Delaware, Florida, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Missouri, New Jersey, Oklahoma, Oregon, Texas and Washington, D. C. Nowhere has the showing of " La Ronde " been banned except in New York. While experience elsewhere is not binding on the courts in New York, the opinions of qualified critics may be considered (*United States* v. *One Book Entitled Ulysses,* 72 F. 2d 705). We deem it significant that in the States of Louisiana (La. Rev. Stat., tit. 4, §§ 301–307) and Massachusetts (Mass. Ann. Laws, ch. 136, §§ 2–4) having censorship laws, though to be sure, not as comprehensive as that in New York, the picture has had an unhampered showing as well as in places where municipal codes are in effect such as Detroit, Michigan; Salem, Oregon and Houston, Texas, to mention a few, a circumstance indicating that in a large segment of society the picture is not offensive per se. Such a showing in other States and cities of this country, where prior restraint was available and not invoked, and elsewhere having no such statutes, all without untoward incident or complaint, is a convincing testi-

monial that it is not inimical to the public peace, welfare and safety. On the contrary, we are told that the showing elsewhere has been well received and has elicited favorable acclaim by the premier dramatic critics of eminent publications in which we may read:

"*La Ronde* is all of a piece, as any round should be, setting up a mocking harmony of desire and disillusion, vanity, pleasure and deceit. It is never prurient, smirking or pornographic. For all the intimacy of its nuances, the film's approach is dryly detached and completely charming; it spoofs sex rather than exploits it, much as Britain's satiric *Kind Hearts and Coronets* makes sport of murder." (*Time* Magazine, Oct. 22, 1951.)

"Here is a lovely motion picture, a gay, a glad, a sad, a sentimental movie * * * about Vienna at the turn of the century, the Vienna of candlelight and carriages, of wine, women and waltzes. * * * All this is told with a combination of irony, candor and gentleness that makes of the whole a total gem of a motion picture. * * * a picture about illicit love, but it is told without prudishness and with a deftness, discretion and understanding that make it more moral than most censor-shackled pictures on the subject." (*Daily News,* Los Angeles, Sept. 21, 1951.)

"The * * * players * * * represent the cream of France's romantic actors." (*The Evening Star,* Washington, D. C., July 28, 1951.)

"The players * * * are among the cream of French talent and virtually flawless here." (*The Los Angeles Times,* Sept. 21, 1951.)

"* * * a splendid and glittering cast that includes Anton Walbrook, Gerard Philipe, Isa Miranda, Dannielle Darrieux, Daniel Gelin, Simone Simon, Jean-Louis Barrault, Fernand Gravet, and Odette Joyeux. * * * their portrayals have that quality of nuance that makes a second viewing almost obligatory. * * * Through the strata of a world-weary Viennese society the story spirals, until we find we have arrived at much the same point from which we have begun. It's more sad than bitter, more ironic than funny, and there's some haunting little message underneath it all, though, to be sure, you are never quite told what it is. * * * delicately done and in excellent taste." (*Saturday Review of Literature,* Nov. 10, 1951.)

In addition, it has been shown in the principal cities of most foreign countries and has received special recognition for merit from several motion picture academies as, for instance, in Cuba as the best film of 1951, by the British Film Academy in London as the best film from any source, British or foreign, and in 1952, a nomination for an award at the Hollywood Academy.

Nonetheless if it may be said that prior censorship serves a necessary and needful public purpose warranting the abridgement of the right of free speech and press, it remains for the statute under review to meet the test of definiteness required to constitute a valid delegation of legislative power to an administrative agency. Unless it does so, it cannot be regarded as the " clearly drawn statute " envisioned by the Supreme Court (*Burstyn, supra,* p. 506; *Kunz* v. *New York,* 340 U. S. 290; *Winters* v. *New York,* 333 U. S. 507; *Connally* v. *General Constr. Co.,* 269 U. S. 385; *Small Co.* v. *American Sugar Ref. Co.,* 267 U. S. 233; *United States* v. *Cohen Grocery Co.,* 255 U. S. 81) and we too apply such principle whenever needed (*Packer Collegiate Inst.* v. *University of State of N. Y.,* 298 N. Y. 184; *Matter of Fink* v. *Cole,* 302 N. Y. 216; *Matter of Small* v. *Moss,* 279 N. Y. 288).

It is indeed significant that when the Legislature enacted the censorship statute under review it omitted to provide any criteria or standards to guide the Board of Regents in performing the administrative functions required of it, but was content to use language of broad and general import leaving its meaning and application to the individual judgment of its director of the motion picture division in the first instance (§ 122) or if denied, to a committee of three members of the board (§ 124).

Indefiniteness affords opportunity for arbitrariness, the tendency to which is nowhere better illustrated than in the field of administrative law. It is for this reason that delegation of legislative power is carefully scrutinized, whether to a private agency (*Matter of Fink* v. *Cole, supra*) or to a governmental agency (*Packer Collegiate Inst.* v. *University of State of N. Y., supra; Matter of Small* v. *Moss, supra*). If this is not enough, then the board itself has been equally delinquent in failing to adopt rules and regulations for the guidance of its motion picture division in the exercise of censorship powers, but has left the generality of the statutory language to gain preci-

sion " from sense and experience " (*Mutual Film* cases, *supra*), a method no longer approved (*Burstyn*), and is particularly objectionable here as it vests unlimited restraining control over motion pictures in a censor limited only by what an individual director of the motion picture division or, upon review, by what three members of the board itself happen to think about a particular picture at a given time (cf. *Winters* v. *New York, supra; Gelling* v. *Texas,* 343 U. S. 960). Such lack, it goes without saying, leaves an appellate court at a very great disadvantage. We do not know what standards guided the agency in making its determination. To supply such legislative omission by judicial fiat is not permissible under the division of governmental powers as fixed by the Constitution. It has long been recognized that courts may not usurp the legislative function under the guise of adjudication. The evils of allowing an administrative agency, however worthy its purpose, to function without proper legislative guidance is well illustrated by this very case. The lack of proper standards and guidance has led the State Board of Regents into a most surprising record of inconsistency and illustrates at first hand the evils of slap-dash censorship. For instance, we do not know whether they apply the terms " immoral " and " tend to corrupt morals " to pictures dealing with sex impurity or to pictures dealing with any matter which could be deemed *contra bonos mores.* Here we have a picture which, concededly, is not obscene or indecent but which nonetheless is banned from a New York showing because deemed " immoral " and its exhibition " would tend to corrupt morals " which is difficult to reconcile with the issuance of permits to show other pictures dealing not only with illicit love but also crime such as Dreiser's " American Tragedy " (based on *People* v. *Gillett,* 191 N. Y. 107), " A Street Car Named Desire " and " The Outlaw ", and those of a lurid type whose blow-up posters call attention to " Outcast Girls ", " Female Sex ", " Naked Realism ". The case at hand is the only instance brought to our attention where denial has been based solely on the term " immoral " which the Regents applied because " promiscuity " is the central theme. True, the term " immoral " has been used in numerous other instances but always, we note, in juxtaposition with the word " obscene " or " indecent ". The

term " obscene " as used in the criminal statutes, has been interpreted in the United States Supreme Court as meaning the subject matter must be of a " lewd, lascivious and obscene tendency, calculated to corrupt and debauch the mind and morals of those into whose hands it might fall " (*Swearingen* v. *United States,* 161 U. S. 446, 451), and in our own court we have said that the test of an obscene book is whether " the tendency of the matter charged as obscenity is to deprave or corrupt those whose minds are open to such immoral influences, and who might come into contact with it " (*People* v. *Muller,* 96 N. Y. 408, 411, following *Regina* v. *Hicklin,* L. R. 3 Q. B. 360, 369–370; *People* v. *Doubleday & Co.,* 297 N. Y. 687, affd. 335 U. S. 848).

The term " immoral " when not connected with " obscene " — and here it is not — for indeed the motion picture "La Ronde " was not banned upon the ground of obscenity — has a variety of meanings varying according to time, geography and to some extent, subjective judgment (CARDOZO, Paradoxes of Legal Science; *Matter of Foy Productions* v. *Graves,* 253 App. Div. 475; *Parmelee* v. *United States,* 113 F. 2d 729; *United States* v. *Kennerley,* 209 F. 119). The lexicographers have defined "immoral " as the opposite of moral (Oxford Dictionary) which term may and does include illicit sexual behavior (Funk & Wagnalls) but the meaning is not limited to sex impurity but includes in addition offenses hostile " to public welfare " (Black's Law Dictionary), " inimical to rights or * * * interests of others ", " corrupt ", " depraved " and sometimes " unprofessional " conduct or (42 C. J. S., pp. 395–396), to state it broadly, anything *contra bonos mores.*

Resort to the criminal statutes dealing with obscenity and the cases construing such statutes are of little help in solving our present problem for here we deal with a licensing statute authorizing restraint in advance. In the one we deal with evidentiary requirements sufficient to support the conviction beyond " reasonable doubt " while in the other when the issue is debatable " some " evidence is sufficient. In the one the proof must meet the standards of the hearsay rule to assure competency, relevance and materiality while in the other formal rules of evidence may be dispensed with entirely. Criminal statutes are designed to apprise the citizen of what constitutes

an offense against society in advance of the fact. The term "immoral" as used in this pre-censorship statute, without more, affords little help in advising the citizen of what constitutes a violating offense. All that the petitioner has to guide him here is the circumstance that wherever shown in the United States, except New York, the picture "La Ronde" does not offend.

To strike the term "immoral" and the words "tend to corrupt morals" from the statute as indefinite and undefinable will work no serious result. For years New York State has had statutes dealing with obscenity and indecency broad enough to sanction "after the fact" criminal prosecution and punishment, application of which has successfully regulated the publication and sale of books and periodicals without prior censorship (Penal Law, § 1141; cf. *Winters* v. *New York, supra*), as well as statutes sanctioning the punishment of persons presenting obscene, indecent, immoral or impure drama, plays or exhibition shows or entertainment (Penal Law, § 1140-a).

In addition, the word "obscene", when compared with the word "immoral" has a clear and authoritative judicial definition. The Federal standard is whether the book taken as a whole has a "libidinous effect" (*Hannegan* v. *Esquire, Inc.*, 327 U. S. 146; *United States* v. *One Book Entitled Ulysses*, 72 F. 2d 705, *supra*). In New York the test is "whether the tendency of the [work] is to excite lustful and lecherous desire" (*People* v. *Wendling*, 258 N. Y. 451, 453; *People* v. *Eastman*, 188 N. Y. 478, 480; *People* v. *Muller, supra*). Under this definition "La Ronde" is certainly not "obscene". It has been condemned only on the ground that it is "immoral" and that its presentation "would tend to corrupt morals". The statute sets up no standard defining the term "immoral" and, unlike the word "obscenity" in the criminal statutes, there are no judicial opinions which set forth a workable guide for the censor. As the dissenting opinion in the Appellate Division noted (p. 266) "La Ronde", according to the Regents, "deals with illicit love, usually regarded as immoral. But so is murder. The theme alone does not furnish a valid ground for previous restraint. As to its presentation corrupting the morals of the public, this issue is highly debatable. The record indicates a vast body of

informed opinion to the contrary. Under such circumstances the action of the Regents impinges on petitioner's constitutional right of free expression." Since reasonable men may differ on the import and effect of " La Ronde ", it follows that there is not a " clear and present danger " sufficiently imminent to override the protection of the United States Constitution (*Thornhill* v. *Alabama, supra,* p. 105).

Under all the circumstances, and this includes the inconsistency between the varying views expressed in the opinions for affirmance herein, we deem the terms " immoral " and " tend to corrupt morals " as used in the statute to be so indefinite as to require reversal here. Indefiniteness in motion picture censorship statutes was condemned in *Burstyn (supra)* and later in *Gelling* v. *Texas* (343 U. S. 960, *supra*). There the United States Supreme Court dealt with an ordinance of the city of Marshall, Texas, which authorized a local board of censors to deny permission to the showing of a motion picture when, in the opinion of the board, it was " of such character as to be prejudicial to the best interests of the people of said City " — inartistic language to be sure, but nonetheless having an intent to restrain the showing of motion pictures inimical to the public interest. Two Justices wrote concurring opinions that elucidate the bare *Per Curiam* for reversal, Mr. Justice FRANKFURTER seeing offense to the Fourteenth Amendment on the score of indefiniteness (citing *Burstyn* and *Winters*) while Mr. Justice DOUGLAS said (p. 961): "The evil of prior restraint, condemned by *Near* v. *Minnesota,* 283 U. S. 697, in the case of newspapers and by *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, in the case of motion pictures, is present here in flagrant form. If a board of censors can tell the American people what it is in their best interests to see or to read or to hear (cf. *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451), then thought is regimented, authority substituted for liberty, and the great purpose of the First Amendment to keep uncontrolled the freedom of expression defeated."

This thought is not new for indeed thirty years ago a distinguished Governor of this State in his message to the Legislature recommending repeal of an almost identical censorship statute (L. 1921, ch. 715, § 5) had this to say: " Censorship is

not in keeping with our ideas of liberty and of freedom of worship or freedom of speech. The people of the State themselves have declared that every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no law shall be passed to restrain or abridge liberty of speech or of the press. This fundamental principle has equal application to all methods of expression." (Public Papers of Alfred E. Smith [1923], pp. 60, 61.)

As has been said in a great variety of ways, we deem the evil complained of here is far less dangerous to the community than the danger flowing from the suppression of clear constitutional protection. In our zeal to regulate by requiring licenses in advance we are prone to forget the struggle behind our free institutions. We must keep in mind on all occasions that beneficent aims however laudable and well directed can never serve in lieu of constitutional powers (*Carter* v. *Carter Coal Co.*, 298 U. S. 238) for as was said in *Lovell* v. *Griffin* (303 U. S. 444, 451, *supra*), " The struggle for the freedom of the press was primarily directed against the power of the licensor."

It is no answer to say that the exhibition of motion pictures has a potential for evil which can not be successfully dealt with except by censorship in advance. Such a conclusion overlooks the very significant circumstance that other media of expression are not so censored, for they may not be, but are nonetheless successfully controlled by our penal laws (Penal Law, § 1140-a) which have been resorted to whenever necessary. One of the most recent occasions was the banning of " The Outlaw ", a motion picture, by the commissioners of license and the police in New York City, because deemed obscene, indecent and immoral, notwithstanding that the Board of Regents had theretofore issued it a license (*Hughes Tool Co.* v. *Fielding*, 297 N. Y. 1024, affg. 272 App. Div. 1048). Reported instances of resort to criminal sanctions as a method of control are relatively infrequent but this is not at all surprising as the industry itself has its own Production Code in which it recognizes its responsibility to the public to provide approved entertainment in connection with which the potential power of the public boycott is not overlooked, exerting as it does, a direct influence in the box office, on the profitable operation of which

the producers must depend (cf. Motion Pictures and the First Amendment, 60 Yale L. J. 696).

In conclusion then, it must be said that the New York censorship statute as applied in advance to the exhibition of motion pictures infringes constitutional freedom of speech and press, that the within case is not so exceptional as to require banning under a valid exercise of the police power and that the statute is invalid in any event for lack of definitive administrative criteria.

The order appealed from should be reversed and the matter remitted to the Board of Regents with direction to issue a license.

FULD, J. (dissenting). I agree with Judge DYE and, for myself, would add these words only to underscore what he has written.

That the freedom of expression assured by the First Amendment is not limited to '' the air-borne voice, the pen, and the printing press '' (Chafee, Free Speech in the United States [1941], p. 545), but extends as well to motion pictures, is now beyond dispute. (See *Gelling* v. *Texas,* 343 U. S. 960; *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495.) While I conceive that any legislation imposing a previous restraint on the exhibition of moving pictures is condemned by the Constitution, I do not believe it necessary to invoke that broad principle to reach a decision in this case. Here again, as in *Burstyn,* the censorship statute must fall because of the lack of a sufficiently definite standard or guide for administrative action.

The Education Law provision under review authorizes the Regents to prohibit, in advance, the exhibition of any picture which they deem '' immoral '' or which they conclude may '' tend to corrupt morals ''. Terms of such vague and unde-fined limits, however, fail to furnish the objective criterion necessary to insure that there shall be no interference with the exercise of rights secured by the First Amendment. By attempting to cover so much, the catch-all provision barring motion pictures which the censors believe '' immoral '' effec-tively covers nothing. The ephemeral and ambiguous char-acter of the term is highlighted by the variant views of the very judges who now write to uphold the statute. Words as

subjective as those under consideration find meaning only in the mind of the viewer and observer, render impossible administration of the statute and offend against due process. " Prohibition through words that fail to convey what is permitted and what is prohibited for want of appropriate objective standards, offends Due Process in two ways. First, it does not sufficiently apprise those bent on obedience of law of what may reasonably be foreseen to be found illicit by the law-enforcing authority, whether court or jury or administrative agency. Secondly, where licensing is rested, in the first instance, in an administrative agency, the available judicial review is in effect rendered inoperative." (*Joseph Burstyn, Inc.* v. *Wilson. supra,* 343 U. S., at p. 532, per FRANKFURTER, J., concurring; see, also, *Gelling* v. *Texas, supra,* 343 U. S. 960; *Musser* v. *Utah,* 333 U. S. 95.)

I would reverse and annul the determination of the Board of Regents.

LEWIS, J., concurs with FROESSEL, J.; DESMOND, J., votes for affirmance in a separate opinion; CONWAY, J., in a memorandum, concurs in the opinions of FROESSEL and DESMOND, JJ.; DYE, J., dissents in an opinion in which FULD, J., concurs and votes for reversal in a separate opinion; LOUGHRAN, Ch. J., deceased.

Order affirmed.