**R. K. O. RADIO PICTURES, INC., et, Plaintiffs-Appellants, v. DEPARTMENT OF EDUCATION, DIVISION OF FILM CENSORSHIP, Defendant-Appellee.**

Ohio Appeals, Second District, Franklin County.

No. 5166. Decided January 5, 1955.

Wright, Harlor, Purpus, Morris & Arnold, John C. Harlor and Harry Wright, of Counsel, Columbus, for plaintiffs-appellants.

C. William O'Neill, Attorney General, Robert E. Leach, Chief Counsel, Gwynne B. Myers, Asst. Attorney General, Columbus, for defendant-appellee.

(MONTGOMERY, PJ, of the Fifth District, GRIFFITH and NICHOLS, JJ, of the Seventh District, sitting by designation.)

## OPINION

By THE COURT.

Judgment reversed on the authority of **R. K. O. Radio Pictures, Inc., et, v. Department of Education of the State of Ohio, etc., 162 Oh St, 263.**

MONTGOMERY, PJ, GRIFFITH and NICHOLS JJ, concur in the reversal.

MONTGOMERY and GRIFFITH, JJ, do so with reluctance, but feel that the above-mentioned case is conclusive.

NICHOLS, J, concurring in the reversal, submits herewith a separate concurring opinion.

## CONCURRING OPINION

By NICHOLS, J.

This action was instituted in the Common Pleas Court of Franklin County, Ohio, by R. K. O. Radio Pictures, Inc., Independent Theatre Owners of Ohio, a nonprofit corporation, and Martin G. Smith and Horace Adams, individual residents, taxpayers and property owners in Ohio, wherein they seek to enjoin the Department of Education of the State of Ohio, Division of Film Censorship, Clyde Hissong, Superintendent, from requiring compliance with the provisions of §§3305.01 to 3305.99, inclusive, **R. C.**, basing their action upon the claim that such sections of the Revised Code are in conflict with and repugnant to the First and Fourteenth Amendments of the Constitution of the United States, and **Art 1, Sec 2, Sec 11 and Sec 19, and Article XI, Sec 1,** of the **Constitution of the State of Ohio.**

The Common Pleas Court upheld the authority of the defendant, Hissong, as Superintendent of the Division of Film Censorship, in the Department of Education, to censure motion pictures and to require a license from such Department before motion pictures can be exhibited in Ohio, such license obtainable only after an advance private inspection and screening by or under the direction of the Superintendent and at the expense of those engaged in producing and seeking the right of exhibiting motion pictures.

From the decree rendered by the Court of Common Pleas the plaintiffs appealed to the Court of Appeals on questions of law. Judge Montgomery, of the Fifth District, and Judge Griffith, of the Seventh District, sitting by assignment in the Second Appellate District, were reluctant to reverse the decree of the Common Pleas Court and inclined to affirm upon the opinion of Bartlett, J. Since the hearing upon this appeal the Supreme Court of Ohio, in the case of **R. K. O. Radio Pictures, Inc., et, v. Department of Education of the State of Ohio, etc., 162 Oh St 263,** has confirmed my view that the decree of the Common Pleas Court in this case must be reversed. Judges Montgomery and Griffith now reluctantly join with me in such reversal.

In support of my original position I submit the following opinion written by me November 12, 1954, before the decision of the Supreme Court of Ohio reported in **162 Oh St 263,** wherein I was compelled to speak frankly about the opinion of the trial judge, sitting as a chan-

cellor, but without any feeling of disrespect for his honesty and sincerity. (Judge Bartlett's opinion is now published in **68 Ohio Law Abstract, 493,** Ohio Bar of November 29, 1954.)

I am stirred, as I have been many times before, with the eloquent discourse of Judge Bartlett, wherein he sets forth verbatim (without quotation) a portion of the ritual of one of the fine benevolent and patriotic organizations of which we are both members, wherein he describes the difference between liberty and license; and had I needed an endorsement of the able Attorney General of the State of Ohio I must have been convinced by the praise given him by the chancellor.

But the decision of this case rests neither upon oratorical eloquence nor upon fulsome praise of the Attorney General. I am constrained to say that I would have been more persuaded to affirmance in this case had the distinguished judge and the able Attorney General kept more clearly before them the nature of the oath required of them to support, uphold and defend the Constitution of the United States and the Constitution of the State of Ohio, in which event I am sure the decree would have been to the contrary and their fine talents not wasted in whittling away at these great charters of human liberty under which the citizens of the United States have lived, prospered, been happy and secure in the rights and privileges guaranteed by the Bill of Rights.

Likewise, I have no doubt of the honesty and sincerity of Mr. Hissong, and I am well aware of the concern of a great body of the people of this state and nation, well thinking, right living and morally sound individuals, who are alarmed because of what they conceive to be the harmful effect upon our children. Yet many of these good people never attend a motion picture show and many will not have a television set in their home, yet they profess to believe there should be more censoring of motion pictures. I can say with authority that I have never seen a "movie" where the villain of the play was not apprehended and duly punished.

And I have seen exhibited in some of the great art galleries of the world paintings by celebrated artists where the portraits of male and female show them entirely in the nude and engaged in the most lascivious conduct, yet great fortunes are spent in preserving such paintings as works of Art. As I write this, I have taken down from my library and have before me reproductions of some such paintings; one is "The Birth of Venus", by Botticelli; another is "Venus and Cupid" by Valasquez; another is "A Summer Night" by Moore; all in the nude but the work of famous artists. Although such paintings do not offend me I much prefer other reproductions in my library, such as the chaste painting of "The Madonna, Child, St. John and Angels", by Michelangelo, and "The Virgin and Child and Donor" by Jan VanEyck, and "The Adoration of the Kings", by Mabuel, and "The Blue Boy" by Gainesborough, "The Age of Innocence" by Reynolds, and "The Music Lesson" by Muenier.

But the point is, who am I to impose upon another my conception of what is beautiful, or moral, or educational, or amusing. All the famous paintings I have mentioned hang in the great galleries of the world. I imagine I can hear a mother say, "But my children never get into the great galleries of the world." And I can answer that you need not let

your child attend a moving picture show or see a television play—it is up to you.

I do not doubt that abuses may occur under the cloak of our constitutional provisions. But a reference to the arguments in the convention wherein the amendments known as the Bill of Rights were under consideration will demonstrate that the statesmen of that day were quite aware that abuses could be and likely would be perpetrated under the guarantees of free speech and freedom of the press, nevertheless it was decided that the great good arising and preserved under such guarantees far outweighs the evils which might arise.

And in this connection, the trial judge might well have re-examined his knowledge of history, known by every student in our great common schools, from which he would have been reminded that Patrick Henry, who was willing to give his life for the establishment of liberty under the new government then undertaken upon severance of the sovereignty of Great Britain, refused to attend the convention called to approve the Articles of Confederation until assured that freedom of speech and of the press would be guaranteed by a Bill of Rights. This great patriot well understood the difference between liberty and license. He then understood that abuses might arise under such guarantees.

Dean Erwin H. Griswold, of the Harvard University Law School, has well observed:

"Abolishing the Fifth Amendment would be to commit the time honored folly of burning down the house to get rid of the rats. It also would permit the restoration of torture as a method to extract confession from witnesses * * *. The man who abuses his Fifth Amendment privilege will have to live with his own conscience. But using it for protection is his constitutional privilege."

So far as I am aware there is no serious movement to repeal the Fifth Amendment, but there has been, outside the Supreme Court of the United States, a persistent effort to modify it to conform to the private notions of individuals, boards and commissions, acting under legislative sanction such as our censor statutes. Honesty of purpose may well be admitted, but again we see the wisdom of the requirement that every official performing legislative, judicial or administrative functions must first subscribe the oath to faithfully support the State and Federal Constitutions before being permitted to function.

I would admonish the moving picture industry that any violation of the universally recognized laws of decency and morality will bring such condemnation as will destroy this instrumentality capable of so much good in furthering morality, education and wholesome amusement.

The guarantees of freedom of speech and of the press are couched in the unmistakable language that NO LAW shall be passed abridging such guarantees; that language is not susceptible of interpretation that some laws having that effect may be passed while other laws may not be passed. It is interesting to note that Congress has passed no law which abridges the right to transmit motion pictures by television, although television has brought motion pictures into the homes of millions of our people, although many of us are convinced some of such pictures have no education, religious or humorous characteristics.

Thus we arrive at the sole question determinative of this appeal: are motion pictures a form of free speech? In 1914 the Supreme Court of the United States, in the case of Mutual Film Corporation v. Industrial Commission of Ohio, 236 U. S. 230, 59 Law. Ed. 553, affirming the decision of the District Court for the Northern District of Ohio, Eastern Division, 215 Fed. Rep. 138, upheld the legality of the legislative act of Ohio which authorized censoring of motion pictures, evidently on the theory or premise that such pictures did not come within the meaning of freedom of speech.

But the moving picture industry has advanced far since 1914 and by synchronizing the speech with the picture, by the use of advanced 3-D photography, the wide screen and color, motion pictures are now truly a remarkable method of speech and it is now definitely determined by the Supreme Court of the United States that motion pictures constitute a method of speech the freedom of which is guaranteed from abridgment under the Constitution of the United States.

In the case of Joseph Burstyn, Inc., v. Wilson, Commissioner of Education of the State of New York, decided May 26, 1952, 343 U. S., 495, the Supreme Court of the United States went on record "disapproving a contrary opinion expressed in Mutual Film Corp. v. Industrial Commission of Ohio, 236 U. S. 230, 59 Law Ed. 553" and held that "the basic principle of freedom of speech and press applied to motion pictures, even though their production, distribution and exhibition is a large scale business conducted for profit."

Since the decision in the Burstyn case, in every action coming before the Supreme Court of the United States that tribunal has voided every attempt to deny to motion pictures the guarantee of freedom of speech. See:

Winters v. New York, 333 U. S. 517, 92 Law Ed. 840; W. L. Gelling, Appellant, v. State of Texas, 343 U. S. 960, 96 Law Ed. 1359; Commercial Pictures Corp. v. Board of Regents of University of New York, 346 U. S. 587, 98 Law Ed. (Advance p. 235), No. 274; Superior Films, Inc., Appellant, v. Department of Education of the State of Ohio, Division of Film Censorship, Clyde Hissong, Superintendent, 346 U. S. 587, 98 Law Ed. (Advance p. 235), No. 217. (Thus reversing the Supreme Court of Ohio, 159 Oh St 315.)

The fearless courage of the members of the Supreme Court of the United States is shown by the unanimous decision reversing the Court of Appeals of New York, thus striking down the effort to censor the picture "Laronde", which was the subject of the litigation involved in that case. An examination of the character (or lack of it) in that picture, is revealed in the opinion of the New York Court of Appeals, 113 N. E. 2d, 502, wherein it is seen that the picture transgresses all bounds of decency and morality. I quote from 113 N. E. 2d, 502:

"The film from beginning to end deals with promiscuity, adultery, fornication and seduction. It portrays ten episodes, with a narrator. Except for the husband and wife episode, each deals with an illicit amorous adventure between two persons, one of the two partners becoming the principal in the next. The first episode begins with a prostitute and a soldier. Since the former's room is ten minutes walk from their meeting

place on the street, and the soldier must hurry back to his barracks, they take advantage of the local environment. She informs him that 'civilians' pay, but for 'boys like you its nothing'. The cycle continues with the soldier and a parlormaid; the parlormaid and her employer's son; the latter and a young married woman; the married woman and her husband; the husband and a young girl; the girl and a poet; the poet and an actress; the actress and a count, and finally the count and the prostitute. At the very end, the narrator reminds the audience of the author's thesis: 'It is the story of everyone'."

In the opinion of the trial court in the case we review the judge made only the scant statement that the Supreme Court of the United States reversed the judgment of the Court of Appeals of New York, but in my judgment such reversal definitely establishes that any law which abridges the guarantee of freedom of speech is unconstitutional.

From the syllabi to the two cases last cited, I quote first that which is applicable to No. 217:

"1. The constitutional guaranty of free speech and press is violated where a state vests in a state official the power to refuse a license, required by state law for the exhibition of a motion picture, on the ground that it is 'immoral' and 'would tend to corrupt morals,' or is 'harmful'."

And next I quote what is held applicable to No. 274:

"2. The constitutional guaranty of freedom of speech and press prevents a state from establishing censorship over motion pictures. (Per Douglas and Black, JJ.)"

And here I think it pertinent to quote in full what is said by Mr. Justice Douglas, with whom Mr. Justice Black agrees, concurring:

"The argument of Ohio and New York that the government may establish censorship over moving pictures is one I cannot accept. In 1925 Minnesota passed a law aimed at suppressing before publication any 'malicious, scandalous and defamatory newspaper'. The Court, speaking through Chief Justice Hughes, struck down that law as violating the Fourteenth Amendment, which has made the First Amendment applicable to the States. Near v. Minnesota, 283 U. S. 697, 75 L. Ed. 1357, 51 S. Ct. 625. The 'chief purpose' of the constitutional guaranty of liberty of the press, said the Court, was 'to prevent previous restraints upon publication'. Id. 283 U. S. p. 713.

"The history of censorship is so well known it need not be summarized here. Certainly a system, still in force in some nations, which required a newspaper to submit to a board its news items, editorials, and cartoons before it published them could not be sustained. Nor could book publishers be required to submit their novels, poems ,and tracts to censors for clearance before publication. Any such scheme of censorship would be in irreconcilable conflict with the language and purpose of the First Amendment.

"Nor is it conceivable to me that producers of plays for the legitimate theatre or for television could be required to submit their manuscripts to censors on pain of penalty for producing them without approval. Certainly the spoken word is as freely protected against prior restraints as that which is written. Such indeed is the force of our decision in

Thomas v. Collins, 323 U. S. 516, 540, 89 L. Ed. 430, 445, 65 S. Ct. 315. The freedom of the platform which it espouses carries with it freedom of the stage.

"The same result in the case of motion pictures necessarily follows as a consequence of our holding in Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495, 502, 96 L. Ed. 1098, 1106, 72 S. Ct. 777, that motion pictures are 'within the free speech and free press guaranty of the First and Fourteenth Amendments.'

"Motion pictures are of course a different medium of expression than the public speech, the radio, the stage, the novel, or the magazine. But the First Amendment draws no distinction between the various methods of communicating ideas. On occasion one may be more powerful or effective than another. The movie, like the public speech, radio, or television, is transitory—here now and gone in an instant. The novel, the short story, the poem in printed form are permanently at hand to reenact the drama or to retell the story over and over again. Which medium will give the most excitement and have the most enduring effect will vary with the theme and the actors. It is not for the censor to determine in any case. The First and the Fourteenth Amendments say that Congress and the states shall make 'no law' which abridges freedom of speech or of the press. In order to sanction a system of censorship I would have to say that 'no law' does not mean what it says, that 'no law' is qualified to mean 'some' laws. I cannot take that step.

"In this Nation every writer, actor, or producer, no matter what medium of expression he may use, should be freed from the censor."

Thus has been repudiated by the Supreme Court of the United States all of the fine reasoning previously advanced for the deviation from the plain unambiguous inhibition of the Constitution relating to abridgment of the right of free speech and of the press. It is fair here to state that Judges Taft and Stewart of the Ohio Supreme Court dissented from the majority decision announced in 159 Oh St 352.

It is my judgment that the censor statutes of Ohio are unconstitutional and void.

In deference to my high regard for the Judge of the Common Pleas Court of Franklin County and the distinguished Attorney General of the State of Ohio (as well as Mr. Hissong, Superintendent), it is desired to mention that both these fine officials seized upon and were misled by certain expressions in the opinions of the members of the U. S. Supreme Court to the effect that the Court was only deciding the issues raised in each case and was not attempting to decide therein that all censorship statutes were beyond the power of the state to create and maintain. It is a fundamental principle, however, that all courts customarily limit their decisions to the law governing the facts in each particular case. But from the over-all reasoning of the Supreme Court of the United States in its recent decisions and its universal reversal of every case upholding censoring, it is quite evident the Supreme Court has declared the censor provisions of the Ohio Motion Picture Censorship Act contravene the First and Fourteenth Amendments to the Constitution of the United States.

I am well aware of the hope, in which I share, that some means may be conceived to curb and prevent abuses condemned by all right think-

ing persons. There is hope in the program set forth in the pastoral letter addressed by the Most Reverend Emmet M. Walsh, Bishop of Youngstown, to all his churches, calling upon Catholics to boycott **morally objectionable** moving picture exhibitions. I am certain the good Bishop does not intend that his people shall deprive themselves of the benefit and enjoyment of the many wonderful pictures shown upon the screen and by television, presenting as they do the opportunity for all to see and hear the great dramas, the musical extravaganzas, the historical sequences such as in "You Were There", the political arguments, the news of what is going on daily in the world, the religious services, the adoration of Christ at the Christmas season, the wholesome amusement for the children as well as adults. Others may shut their eyes and their ears to these things but I thank God for having let me live in the day when these blessings have come about through motion pictures and television, realizing that most of that which is presented must first be acted and produced in the studios provided by the moving picture industry.

It is yet possible that through the churches of all denominations, the civic organizations, the service societies and other means, ways may be provided to censor that which is evil without sacrificing our sacred Bill of Rights. The call of Bishop Walsh is a call to arms against which the motion picture industry cannot long dare to offend. It was a grievous mistake to bring to the United States the foreign production "LaRonde".

In the case we review, the Common Pleas Judge based his decision largely upon the police power of the State to protect the morals of its citizens. It is elementary that the police power of the State cannot transcend the limits of the Constitution of the United States.